## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Ronald L. Lindberg,                                    Civ. No. 11-2396 (PJS/JJG)

                 Plaintiff,

v.                                                                      REPORT AND RECOMMENDATION

Commissioner of Social Security,

                 Defendant.

_____

JEANNE J. GRAHAM, United States Magistrate Judge

      Plaintiff Ronald L. Lindberg seeks judicial review of the administrative denial of his application for Social Security disability insurance benefits and supplemental security income. The case was referred to this Court for a report and recommendation pursuant to 28 U.S.C. § 636(b) and is presently before the Court on cross-motions for summary judgment.

      Plaintiff asserts two errors by the Defendant Commissioner of Social Security: (1) that the Administrative Law Judge (ALJ) erroneously concluded that Plaintiff's substance abuse was a materially factor contributing to his disability; and (2) that the ALJ failed to attach a Psychiatric Review Technique Form (PRTF) and insufficiently addressed the paragraph B and C criteria of 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. For the reasons stated below, the Court recommends that Plaintiff's Motion be denied and Defendant's motion be granted.

## I.      Background

      Plaintiff filed for disability insurance benefits (DIB) on February 7, 2008 and supplemental security income (SSI) on February 25, 2008, alleging disability onset as of February 1, 2006. (R. at 8.) His alleged disabilities included the mental impairments of

bipolar disorder and substance addiction disorder. (R. at 11.) Plaintiff's claims were initially denied on May 20, 2008, and on reconsideration on August 20, 2008. (R. at 8.) Plaintiff timely requested a hearing before an ALJ on August 20, 2008. (R. at 8.) The Commissioner's review culminated in an adverse decision on May 19, 2010. (R. at 19.)

### A.     Medical Evidence

Plaintiff, a Level I Sexual Offender (R. at 441), has a history of chemical dependence and psychological impairments. He has been hospitalized and committed to psychiatric facilities numerous times. Since the February 1, 2006 alleged disability onset, Plaintiff first sought medical care at St. Gabriel's Hospital emergency room on February 7, 2006. (R. at 271.) At St. Gabriel's, lab tests did not indicate any abnormality, but he did test positive for marijuana. (R. at 271.) He was found to have no medical problems and was released. (R. at 271.)

February 12, 2006 Plaintiff was admitted to the emergency room for recurring psychotic episodes, with flight of ideas and mood swings. (R. at 266.) When being admitted, he acknowledged significant alcohol use and stated he had had not been taking his medication. (R. at 266, 276, 282.) Plaintiff also tested positive for marijuana. (R. at 266.) Plaintiff was admitted to the hospital. (R. at 266.) Plaintiff reported his wife had attacked him and broke windows in his home. (R. at 274.) When Plaintiff restarted his course of medication, he responded very well and he was very stable on April 6, 2006, when he was provisionally discharged. (R. at 266.) Plaintiff was discharged to live at home with his parents, continue treatment at Northern Pines Mental Health Center ("NPMHC") in Little Falls, Minnesota, have continuing psychosocial services, and return to work. (R. at 267.)

Plaintiff began treatment at NPMHC on April 10, 2006. (R. at 291.) When Plaintiff appeared for intake and an initial assessment at NPMHC, he reported feeling "happier than [he'd] felt for many, many years." (R. at 305.) He was diagnosed with: Bipolar Disorder, NOS; Alcohol Dependence; Cannabis Dependence; and Partner Relational Problems. (R. at 291.) The initial condition and prognosis was that Plaintiff's condition was "Fair to good w/ abstinence from chemicals & medication compliance." (R. at 291) Plaintiff's chief complaint on admission to NPMHC was that he needs to be on medications and the medications he was recently given for the first time were very helpful. (R. at 292.)

Plaintiff was examined by Dr. James D. Swenson, M.D., a consulting psychiatrist. (R. at 292.) Plaintiff reported that his chemical dependency dated back to when he was 11 years old. (R. at 293.) Plaintiff's thought processes were determined to be logical, but he remembered times where they were illogical. (R. at 295.) Further, Plaintiff's associations were classified as "intact." (R. at 293.) Plaintiff reported periods of being psychotic, filled with confusion and hallucinations. (R. at 293.) Dr. Swenson reported that Plaintiff was oriented to all spheres (R. at 293) and assigned a GAF score of 50[1] (R. at 296). Plaintiff was diagnosed with Major Depressive Disorder, NOS and Bipolar Disorder. (R. at 296.) Dr. Swenson also noted that Plaintiff's alcohol and cannabis dependence were in remission. (R. at 296.) Most importantly, Dr. Swenson recommended Plaintiff stay in therapy and continue his chemical dependence support. (R. at 297.) Swenson saw no need for further testing, but noted that he would continue to monitor Plaintiff. (R. at 297.)

------

[1] Global Assessment of Function scores are subjective ratings of the psychological, social, and occupational functioning of adults. *Diagnostic and Statistical Manual of Mental Disorders*, 32-33 (4th ed., Am. Psychiatric Ass'n 1994) (DSM-IV-TR). A GAF score of 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning. DSM-IV-TR 34.

Plaintiff continued to receive therapy at NPMHC for several months. He acknowledged notable developments in his feelings and emotional and psychological progress. For example, Plaintiff noted that he was avoiding friends who had previously been negative influences on his decision-making. (R. at 305.) He reported that he had avoided using drugs and alcohol since his discharge. (R. at 305.) While Plaintiff was unemployed at the time, he expressed a "desire and need to find work." (R. at 306.) Moreover, Plaintiff had a very regimented schedule that consisted of waking at 6:30 a.m., taking medications, going on a two-mile walk, and going to bed between 9:30-10:30 p.m. (R. at 306.) Later on, Plaintiff noted that he was "doing relatively well." (R. at 304.) Plaintiff had established numerous goals for himself that included getting a job, his own place, and his driver's license. (R. at 304.)

In June 2006, Plaintiff obtained full-time employment that he quit after two weeks "due to incompatibility of the type of work . . . with his medications and side effects." (R. at 302.) Plaintiff reported that, while he had been feeling lethargic, his lethargy was waning since changes in his medication regimen. (R. at 302.) Plaintiff "reported in general he is feeling better with regard to his mental and physical well-being." (R. at 302.) Having made sober friends, Plaintiff was resisting urges to drink alcohol. (R. at 302.) Plaintiff reported frustration that his estranged wife was attempting to contact him, despite his having obtained a restraining order against her. (R. at 302.) The record does not indicate that Plaintiff began to drink or became noncompliant with his medication as a result of any added stress of his wife's attempts to contact him.

In July 2006, Plaintiff was "attending AA meetings, exercising, fishing when possible, watching television, reading, and helping his parents as needed." (R. at 300.) He reported

feeling "okay . . . a little better . . . no crazy thoughts." (R. at 300.) In September 2006,
Plaintiff presented with "bright affect" and noted that his feelings of lethargy were absent. (R.
at 299.) Plaintiff's general demeanor at his September 11, 2006, therapy session was positive.
(R. at 299 (noting that Plaintiff had a constant smile throughout the session but he was not
"going a thousand miles an hour").)

Plaintiff's next therapy session, in November 2006, was similarly positive. Despite
having some understandable concerns regarding a hearing to reinstate his driver's license and
mounting debt during his unemployment, Plaintiff denied that his worries were problematic
and reported he was "managing it with positive thinking." (R. at 298.) Plaintiff reported eating
healthy, exercising, having an even mood, and he denied using or having urges to use alcohol.
(R. at 298.) In December 2006, Plaintiff met with his family practice physician Dr. James
Gehant, M.D., who reported that Plaintiff was only taking Zoloft regularly, was "doing fine,"
his mood was good, his sleep and appetite were good, and he was "interacting with folks OK
and indeed seem[ed] to be very pleasant and well adapted right now." (R. at 318.) Plaintiff
reported that while he did not regularly drink, he would have a drink on a rare occasion. (R. at
318.)

In October 2007, Plaintiff's brother committed suicide. (R. at 11.) The effect of that
stressful event is evident from Plaintiff's subsequent actions. Plaintiff next visited a hospital
in December 2007, when he went to St. Gabriel's Hospital emergency room. (R. at 332.)
Plaintiff was intoxicated, and exhibiting hypomanic symptoms. (R. at 332-33.) Plaintiff was
discharged to a detox center. (R. at 333.) Later in December 2007, police took Plaintiff to St.
Gabriel's after they found him intoxicated. He reported being off all his medications, he was
using alcohol and drugs, and he had no interest in quitting either. (R. at 327, 340, 346, 394,

710.) Plaintiff was placed on a 72-hour hold, at least in part based on his homicidal thoughts, abusive language, and threatening gestures. (R. at 327.) Plaintiff threatened to slit his mother's neck and reported that he had a gun hidden. (R. at 327.) While Plaintiff's mood stabilized and his condition improved during the 72-hour hold, he was discharged to Baxter Community Behavioral Hospital (Baxter) for further treatment of his bipolar disorder. (R. at 353-54, 433-35.)

During his one-month treatment at Baxter, Plaintiff attributed the most recent set of incidents to stress resulting from his brother's suicide. (R. at 439.) After his brother died, Plaintiff began drinking "and his Bipolar symptomatology was then evident by his reportedly increasing bizarre behavior." (R. at 439.) During his time at Baxter, Plaintiff reported he was "peaceful about being [there]" and that he felt good about a positive relationship he had with a significant other. (R. at 440.)

Plaintiff underwent a psychiatric evaluation by Geoffrey Murrey, Ph.D., L.P., at Baxter in which Dr. Murrey noted weaknesses in "visuospatial, visual perceptual, and visual organizations functions, as well as at least mild deficits and decline in short-term memory in both visual and auditory modalities." (R. at 453.) Murrey went on to note "[s]uch deficits cannot be accounted for solely on the basis of his acute psychiatric condition." (R. at 453.) Dr. Murrey further noted that it was possible that the more chronic deficit was due to Plaintiff's history of polysubstance abuse, as well as a reported traumatic brain injury. (R. at 453.) Plaintiff's medication regimen at this time included Geodon, which was "very effective in treating his mood disorder." (R. at 435.) At the conclusion of his treatment at Baxter, Plaintiff was transferred to residential dependence treatment center in Fergus Falls, Minnesota called Community Addiction Recovery Enterprise ("CARE"). (R. at 433.)

When being admitted to CARE, Plaintiff admitted to drinking a lot since his brother's suicide, and that he stopped taking his medications shortly after being discharged from a mental illness unit in 2005. (R. at 509.) Plaintiff further reported that "[His] mind is sharp and [his] memory is good," but he considered himself hyperactive. (R. at 514.) Plaintiff acknowledged that he is a "real alcoholic." (R. at 514.)

Plaintiff remained in CARE for a month and was provisionally discharged with a transfer to Focus 12 Halfway House (Focus) on March 30, 2008. (R. at 548-49.) Plaintiff only remained in Focus for nine days; he signed out one evening and did not return. (R. at 573.) Aware of his personal limitations, he called the next morning and stated he "was going to check himself into the community behavioral health hospital, as his anxiety level was unmanageable." (R. at 573.) Plaintiff's only diagnosis on discharge was "303.91 Alcohol Dependence: Continuous." (R. at 573.)

Plaintiff next went to St. Gabriel's on April 19, 2008, and complained that he was suffering from anxiety; he reported he was off his medication for one week. (R at 642-43.) Upon examination, it was determined that Plaintiff was stable for discharge, and was discharged to his home with a condition of "Improved/Stable." (R. at 643.)

Plaintiff next saw Dr. Gehant on May 1, 2008, where he reported his Geodon was making him ill. (R. at 648.) Dr. Gehant prescribed a Klonopin refill which Plaintiff had indicated was "working well." (R. at 648.) Plaintiff reported he was sleeping well at night and did not need to be sedated during the day. (R. at 648.) Dr. Gehant noted that it sounded as if Plaintiff was doing well and that he generally got his medications as needed. (R. at 648.) Plaintiff did not report any problems with relationships or with the law and he was not having other "typical manic problems." (R. at 648.)

In May 2008, Dan Larson, M.D., completed a Psychiatric Review Technique Form ("PRTF") (R. at 663-676) and assessed Plaintiff's residual functional capacity ("RFC") (R. at 677-80). In the PRTF, Dr. Larson indicated that Plaintiff met Listings 12.04 and 12.09. (R. at 666, 671.) In his analysis of the paragraph B criteria, Dr. Larson concluded that each of three criteria were either "moderate" or "mild" limitations. (R. at 673.) Dr. Larson also indicated that Plaintiff had "one or two" episodes of decompensation, each of extended duration. (R. at 673.) Dr. Larson explicitly found that the evidence did not indicate the presence of the paragraph C criteria. (R. at 674.)

In conducting a RFC assessment, Dr. Larson rated Plaintiff as only "Moderately Limited" on five of the twenty mental activity categories and "Not Significantly Limited" on the remainder. (R. at 677-78.) Dr. Larson did not find Plaintiff "Markedly Limited" in any category. (R. at 677-78.) Plaintiff reported doing some laundry and some shopping, and that he enjoyed helping with repairs. (R. at 679.) He reported no problems with getting along with others, including his friends. (R. at 679.) Further, while concentration and stress were down, Dr. Larson assessed the overall picture as "being sufficient for basic chores." (R. at 679.) Dr. Larson went on to note that Plaintiff actually deteriorated with hospitalization. (R. at 679.) Dr. Larson further observed that Plaintiff had "sufficient mental capacity to concentrate on, understand, and remember routine, repetitive 3-4 step and limited detailed instructions." (R. at 679.) A state agency consultant reviewed Dr. Larson's assessment and affirmed his conclusions. (R. at 840.)

Plaintiff next saw Eric Johnson, M.D., a psychiatrist, at the recommendation of the Stearns County Child Support division in June 2008. (R. at 682-83.) Plaintiff appeared for an assessment where he described his history of mental illnesses. (R. at 823-24.) Plaintiff

reported that he was sad, hopeless, anxious, depressed, and was having trouble with sleep. (R. at 823.) Plaintiff denied currently using alcohol. (R. at 824.) Dr. Johnson noted Plaintiff's affect was flat, but his thought process was logical and goal-directed. (R. at 825.) Dr. Johnson also noted Plaintiff's judgment and compliance with prior medication regimens was "fair." (R. at 825.) Dr. Johnson assessed Plaintiff as having a GAF score of 60 and prescribed Lamictal. (R. at 825.) Dr. Johnson opined that Plaintiff was unable to perform any employment in the foreseeable future. (R. at 683.)

In August 2008, Plaintiff saw Dr. Johnson again and he opined that Plaintiff would not be significantly limited in his ability to understand and carry out short and simple instructions, nor would he have significant problems with social interactions. (R. at 832-33.) Dr. Johnson also found that Plaintiff would be "Markedly Limited" in maintaining attention and concentration, performing activities within a schedule, or completing a normal workday and workweek without interruptions. (R. at 832.)

Plaintiff returned to Dr. Gehant in January 2009, where Plaintiff reported that his mood stabilizers were "working just fine." (R. at 859.) Plaintiff returned to Dr. Gehant again in April 2009, where Dr. Gehant again observed that Plaintiff was "doing very well" and he was having "no adverse med effects." (R. at 858.) Dr. Johnson refilled Plaintiff's Lamictal prescription because it had been helpful in keeping Plaintiff's manic periods at bay. (R. at 858.) Plaintiff reported abstaining from alcohol prior to that meeting. (R. at 858.)

Dr. Gehant also filled out a medical opinion form, this time at the request of Plaintiff's attorneys, and, much like Dr. Johnson, opined Plaintiff would be incapable of performing employment in the foreseeable future. (R. at 873.) Dr. Gehant noted that opinion despite comments that Plaintiff was "stabilized on medication." (R. at 873.)

In November 2009, Dr. Gehant performed another examination of Plaintiff. (R. at 884.) Plaintiff's primary complaints at this examination were sweating, a shaky and weak feeling, and sugar cravings. (R. at 884.) Plaintiff demonstrated anxiety, but Dr. Gehant observed an absence of hallucinations, depression, and suicidal ideation. (R. at 884.) Further, Plaintiff was oriented to all spheres, articulate, had appropriate mood and affect, and able to perform basic computations and apply abstract reasoning. (R. at 885.)

Again in December 2009, Plaintiff's attorney asked Dr. Gehant to complete a medical opinion form. (R. at 877.) Dr. Gehant found a mix of mostly mild and moderate limitations, with marked limitations in the ability to understand and remember detailed instructions and the ability to complete a normal workday and workweek without interruptions. (R. 877-79.) Despite finding Plaintiff to be only mildly limited in his ability to carry out short and simple instructions (R. at 878), Dr. Gehant concluded that Plaintiff had a *substantial loss* of the ability to understand, remember, and carry out simple instructions. (R. at 880.) Finally, in March 2010, Dr. Gehant completed yet another medical opinion form indicating that Plaintiff would be unable to perform any employment in the foreseeable future. (R. at 1013.)

Struck by another devastating life event in late-February and early-March 2010, Plaintiff learned that ex-wife's new husband had been sexually assaulting Plaintiff's 18-year-old-daughter for the past four or more years. (R. at 891.) Plaintiff felt "overwhelmed and upset, and did not know what do with this information." (R. at 891.) In early-March 2010, at some point after Plaintiff received this information, a police officer found him "walking around town (Little Falls, MN) intoxicated." (R. at 891.) The officer took Plaintiff to St. Gabriel's emergency room where his blood alcohol level was measured to be .147 and his toxicology screen was positive for cannabis. (R. at 891.)

Plaintiff reported that he considered Lamictal and Klonopin to be the most effective medications for him, but Dr. Patricia Borhart, M.D., Board Certified Psychiatrist, noted that such prescriptions may be "premature given the fact that he continues to use significant quantities of alcohol and marijuana in addition to the medications." (R. at 892.) Dr. Borhart also noted that due to the shortage of psychiatric providers in central Minnesota, where Plaintiff lives, Plaintiff was seeing his primary care doctor, Dr. Gehant for his psychiatric care. (R. at 892.) Dr. Borhart conducted a mental status examination. She noted Plaintiff's somewhat increased psychomotor status, his excessive speech volume, tone, and content, his varied moods, and his somewhat rambling thought process. (R. at 893.) Plaintiff underwent group and individual counseling (R. at 921, 932) and a course of medication improved his condition (R. at 921, 925, 947). Plaintiff was discharged approximately two weeks later in mid-March 2010. (R. at 1016.)

**B.      Administrative Proceedings**

Plaintiff appeared for a hearing before an ALJ on March 24, 2010. (R. at 22.) The ALJ observed: "You know, it's pretty clear to me that he's disabled, you know." (R. at 24.) The ALJ acknowledged that his primary concern, however, was whether Plaintiff's substance abuse was a contributing factor to Plaintiff's disability. (R. at 24 (referring to "12[.]09 problems").) The ALJ explained to Plaintiff that "if [chemical dependence] is a material factor in your disability they don't allow you to get those benefits anymore." (R. at 26.)

A vocational expert, Edward Utides, testified at Plaintiff's administrative hearing very briefly. Utides testified that Plaintiff would be capable of performing a "full range of unskilled – basically, repetitive-type work." (R. at 35.)

The ALJ issued his unfavorable written decision on May 19, 2010, finding that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act. Following the sequential evaluation process for disability determinations promulgated in 20 C.F.R. § 416.920(a)(4), the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the application date of February 1, 2006. (R. at 11.) Next, the ALJ determined that Plaintiff had severe impairments of bipolar disorder and a history of substance abuse. (R. at 11.)

At step three, the ALJ determined that Plaintiff's bipolar disorder met Listing 12.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 12.) The ALJ also determined that Plaintiff's substance addiction disorder met Listing 12.09. (R. at 12.) The ALJ further noted three periods during which Plaintiff's impairments were especially apparent: in February 2006, following the deterioration of his marriage; in October 2007, following his brother's suicide; and in January 2010, after learning of his daughter's sexual abuse. (R. at 11-12.) The ALJ also found that if Plaintiff's substance abuse subsided, his bipolar disorder, "which is separate and distinct from his substance abuse," would constitute a severe impairment. (R. at 13.) Despite that finding, the ALJ determined that if Plaintiff "stopped the substance use, [he] would not have an impairment or combination of impairments that meets or medically equals" any impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13.) The ALJ determined that the "paragraph B" criteria would not be satisfied if Plaintiff stopped his substance use, nor would the "paragraph C" criteria be satisfied. (R. at 14.)

In determining Plaintiff's RFC, the ALJ determined Plaintiff would be able to "perform a full range of work at all exertional levels but with the following nonexertional limitations: routine, repetitive, unskilled work tasks, with superficial contact with coworkers

and the public." (R. at 14.) The ALJ considered third-party observations by Plaintiff's social worker, Richard Berg, and his mother, Sally Rose Lindberg, finding that those observations were "sincere, well-intentioned, and essentially consistent with [Plaintiff's] asserted pain and limitations." (R. at 15.) The ALJ relied on Berg's comments that Plaintiff's inability to work were attributable to his incarcerations, hospitalizations, and lack of motivation. (R. at 15.) The ALJ contrasted those statements with Plaintiff's claims that his impairments were the principal barriers to his engaging in substantial gainful activity. (R. at 15.) Accordingly, the ALJ refused to reduce Plaintiff's RFC from the above-described limitations. (R. at 15.) The ALJ gave the "greatest weight to the opinion of the state agency psychological consultants, who found [Plaintiff] capable of routine, repetitive three to four step work tasks, with superficial contact with coworkers and the public." (R. at 15.)

The ALJ determined that if Plaintiff stopped his substance use, the remaining limitation could produce the alleged symptoms, but Plaintiff's complaints regarding the "intensity, persistence and limiting effects" of those symptoms were not credible to the extent they were inconsistent with the RFC. (R. at 15.) Specifically, the ALJ found that Plaintiff's extended periods of sobriety and compliance with medication significantly improved Plaintiff's symptoms. (R. at 15.) The ALJ further noted Plaintiff's admission that medication was effective. (R. at 15.) Indeed, the ALJ took special care to note that Plaintiff's hospitalization in February 2006 occurred only after Plaintiff stopped taking his medication and his hospitalizations in October 2007 and January 2010 after Plaintiff stopped taking his medication and resumed consumption of alcohol. (R. at 16.)

The ALJ refused to give significant weight to Dr. Gehant's comments that Plaintiff would be unable to perform any employment in the foreseeable future because they were

13

vague, conclusory and inconsistent with the record. (R. at 16.) Further, the ALJ did not give Dr. Johnson's opinion that Plaintiff would be unable to perform employment in the foreseeable future significant weight because they were inconsistent with the evidence of record, specifically the opinions of the Disability Determination Services medical consultants. (R. at 17.)

The ALJ considered the opinion of one of Plaintiff's mental health professionals at Nystrom and Associates. (R. at 17.) That mental health professional found a "substantial loss of ability to understand, remember and carry out simple instruction, make judgments that are commensurate with the functions of unskilled work, and respond appropriately to supervision, coworkers, and usual work situations." (R. at 17.) This opinion was internally inconsistent and the ALJ did not give it great weight. (R. at 17.)

Finally, at the fifth step the ALJ determined, considering all of Plaintiff's impairments and abilities, that there would be a significant number of jobs in the national economy that Plaintiff could perform. (R. at 18.) The ALJ found that Plaintiff had no exertional limitations and his nonexertional limitations would have little or no effect on "the occupational base of unskilled work." (R. at 19.) Accordingly, the ALJ determined Plaintiff was not disabled during any period of alleged disability. (R. at 19.)

The Appeals Council denied review of the ALJ's decision, which therefore became the final decision of the Commissioner. (R. at 1.) Plaintiff then commenced this action for judicial review.

## II.     Discussion

### A.     Standard of Review

To receive Social Security disability benefits, an individual must be disabled. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010); *Martonik v. Heckler*, 773 F.2d 236, 238 (8th Cir. 1985). The burden of proving disability is on the plaintiff at each phase of the inquiry. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

On review of an ALJ's decision denying disability benefits, a court examines the administrative record to determine whether the ALJ's findings are "supported by substantial evidence in the record as a whole." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008) (citation omitted); *see also* 42 U.S.C. § 405(g). Substantial evidence in the record is "more than a mere search for the existence of evidence supporting the Commissioner's decision." *Bauer v. Soc. Sec. Admin.*, 734 F. Supp. 2d 773, 799 (D. Minn. 2010) (Kyle, J.) (citations omitted). Although the Court must consider "[e]vidence that both supports and detracts from the ALJ's decision," the ALJ's decision may not be reversed merely because some evidence supports another outcome. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). Substantial evidence "means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* It is less than a preponderance, though. *Id.*

If it is possible to reach conflicting positions from the record, but one of those positions is that of the ALJ, the decision must be affirmed. *Id.* Indeed, this Court may not reverse the Commissioner's decision simply because this Court would have reached a different conclusion had it been sitting as the finder-of-fact. *Bauer*, 734 F. Supp. 2d. at 799 (citing *Harris v. Shalala*, 45 F.3d 1190, 1193 (8th Cir. 1995)).

> **B.**     **The ALJ's Determination that Plaintiff Would not Be Disabled if He Stopped His Substance Abuse**

Plaintiff challenges the ALJ's determination that Plaintiff's substance abuse was a contributing factor material to a disability determination. The primary inquiry in determining whether a disability claimant would be disabled but for his substance abuse is simply whether that person would still be found disabled if he or she stopped using drugs or alcohol. 20 C.F.R. § 404.1535. If substantial evidence supports a finding that the drug or alcohol use is a contributing factor material to the disability determination, the agency will issue a non-disability determination. *Id.*

Plaintiff argues that his "mood instability and chemical dependency are co morbid [sic] and impossible to separate." (Pl.'s Mem. at 9.) The Court disagrees. The record reflects a consistent pattern of sobriety and positive responses to medication during long periods between shocking, stressful life events. Indeed, Plaintiff's relapses and hospitalizations were caused by the deterioration of his marriage, his brother's suicide, and learning of his daughter's sexual abuse. Between these events, Plaintiff responded well to treatment and medication, and maintained sobriety for periods of 23 and 20 months. Substantial evidence supports the conclusion that Plaintiff's most significant problems were caused, not by his own mental impairment, but rather by life events for which he self-medicated with alcohol and marijuana.

Plaintiff claims that the ALJ failed to develop the record regarding Plaintiff's limitations or activities during the periods of sobriety. As the Commissioner points out, however, the record is rife with examples of Plaintiff's abilities during his sobriety. Plaintiff explained that, while he was sober and compliant with his medication, he felt comfortable, made friends, and looked forward to working and living independently. (R. at 15.) He further

explained that he was only concerned about debt from his period of unemployment and his upcoming hearing regarding the reinstatement of his license. (R. at 15.) Plaintiff further explained that he was sleeping well, exercising daily, and planned to start working in construction. (R. at 15-16.) Even Dr. Gehant, who later opined that Plaintiff would be unable to perform any work in the foreseeable future, described Plaintiff as "very pleasant, cooperative, focused, and in general doing well," and that Plaintiff appeared "well groomed, oriented, with an appropriate mood and affect, and normal speech, language, and thought content. There was no evidence of hallucinations, delusions, obsessions or homicidal/suicidal ideation." (R. at 17.)

Plaintiff cites a third-party function report submitted by his mother in July 2008. (R. 206-13.) In the report, Plaintiff's mother indicated that Plaintiff slept about twelve to fourteen hours per day, that he sometimes did laundry, but seldom did chores around the home, that he had no energy, only went outside about twice a week, and had little interest in fishing anymore. (R. at 206-10.) Plaintiff's mother noted, however, that Plaintiff followed instructions well and could walk about a mile before needing to rest. (R. at 211.) Plaintiff also relies on an adult function self-report in which he also reported sleeping twelve to fourteen hours per day, failed to do housework, and was incapable of paying attention. (R. at 216-17.) Plaintiff claims that the ALJ need not credit that evidence, but his failure to investigate it was error. (Pl.'s Mem. 10.)

Plaintiff contends that the evidence offered by these reports "support[] the conclusion that periods of mania have caused alcohol abuse rather than the reverse." (Pl.'s Mem. 10.) While that may be accurate, it mischaracterizes the standard of review. Simply because there is evidence to support that conclusion does not mean the ALJ's decision may be reversed.

*Goff*, 421 F.3d at 789 (holding that the existence of evidence to support an opposite conclusion does not compel the court to reverse the ALJ's determination). The Commissioner, on the other hand, responds with substantial evidence, recounted below, that supports the findings that Plaintiff was generally active and relatively healthy during periods of sobriety.

The reports from Plaintiff and his mother coincided with reports from Dr. Johnson who opined that Plaintiff would not be significantly limited in his ability to understand and carry out short and simple instructions, nor would he have significant problems with social interactions. (R. at 832-33.) Dr. Johnson further noted that, while Plaintiff's affect was flat, his thought process was logical and goal-directed. (R. at 825.) Dr. Johnson assessed Plaintiff as having a GAF score of 60.[2] (R. at 825.)

The Commissioner highlights evidence that Plaintiff, while sober and actively looking for work, would wake at 6:30 a.m., take his medications regularly, attend AA meetings, and regularly help with household activities, then go to sleep between 9:30 and 10:30 p.m. (R. at 300, 303, 304, 306.) Indeed, During Plaintiff's sobriety, he demonstrated good concentration, an excellent attention span, and an ability to follow directions. (R. at 295.) He reported doing fine with respect to depression. (R. at 318.) The Commissioner relies on significant evidence to demonstrate Plaintiff's own admissions that he was active, helping friends with work, going for daily two-mile walks, and generally living a relatively normal life. (Def.'s Mem. 20.)

The Commissioner continues to describe Plaintiff's functioning during his second long period of sobriety by pointing out that Dr. Gehant gave very positive mental status exams in January and April 2009. (Def.'s Mem. 22.) Dr. Gehant noted that Plaintiff's medication was

---

[2] A GAF score of 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV-TR 34.

working just fine, that his mood was significantly improved, and that his medication had no adverse side effects. (R. at 859, 858.)

The Court agrees with the Commissioner's position that the ALJ's RFC finding is supported by substantial evidence. Indeed, the record indicates a pattern of sobriety followed by a confounding life event that would drive Plaintiff to use alcohol and marijuana. The ALJ separated the substance abuse from Plaintiff's bipolar disorder and found that "during period[s] of substance use, the claimant is unable to work competitively . . . ." (R. at 12.) The ALJ went on to note that Plaintiff's bipolar disorder was "separate and distinct from his substance abuse." (R. at 13.) That substance use exacerbates and materially contributes to Plaintiff's bipolar disorder, which render him incapable of retaining a job. Because his substance use is a contributing material factor, however, Plaintiff is precluded from receiving SSI and DIB. Therefore, the ALJ's decision to deny benefits is affirmed on these grounds.

**C.      The ALJ's Failure to complete and attach a Psychiatric Review Technique Form (PRTF)**

Plaintiff also asserts that the ALJ failed to attach a PRTF to his decision and failed to adequately consider subpart C. Relying on *Anderson v. Callahan*, 981 F. Supp. 1258, 1267 (E.D. Mo. 1997), Plaintiff argues that failure to complete a PRTF alone warranted reversal and remand. (Pl.'s Mem. 11.) *See also Montgomery v. Shalala*, 30 F.3d 98, 100 (8th Cir. 1994) (citations omitted) (citing cases from other circuits acknowledging that failure to complete a PRTF is grounds for reversal and remand). In *Montgomery*, the district court held that failure to attach a PRTF to an ALJ's report was harmless error. *Id.* at 100. The Eighth Circuit reversed and remanded because it disagreed that under those circumstances, the omission was harmless error. *Id.* That determination turned primarily on the ALJ's failure to fully develop the record and precisely state the claimaint's disabilities. *Id.*

19

Plaintiff's argument is unavailing, however. The Commissioner is required to "record the presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, *or in the decision at the administrative law judge hearing and Appeals Council levels*." 20 C.F.R. § 404.1520a(d)(2) (emphasis added). The regulation requires the Commissioner to either complete a PRTF at the initial and reconsideration levels or in the ALJ's decision. Plaintiff cites numerous cases for the proposition that an ALJ's failure to attach a PRTF to his decision is reversible error.[3] All of the cases Plaintiff cites, including *Montgomery*, are distinguishable because they predate a change in the regulations which ended the requirement that an ALJ attach a PRTF to his decision. *See Hutson v. Astrue*, No. ED CV 08-01085-VBK, 2009 WL 1303355, at *3 (C.D. Cal. May 8, 2009) ("Following the September 2000 amendments to the regulations which modified 20 C.F.R. § 404.1520a(e)(2) and § 416.920a(e)(2), the [ALJ] is no longer required to complete and attach a [PRTF].").

*Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007) is instructive. In *Nicola*, the Eighth Circuit ultimately remanded because the ALJ did not engage in a sufficient psychiatric review technique. *Id.* at 887. But in describing the requirements of psychiatric review, the court noted that at the ALJ and Appeals Council levels, "it is permissible for the analysis to be included within the written decision such that the use of a written form is not required." *Id.*

Here, the ALJ discussed Listings 12.04 and 12.09, as well as the criteria contained in paragraph B. While Plaintiff claims the ALJ erred by considering only one of Plaintiff's hospitalizations as a "period of decompensation," that error is harmless because none of the

---

[3] *Montgomery*, 30 F.3d 98 (8th Cir. 1994); *Pratt v. Sullivan*, 956 F.2d 830, 834 (8th Cir. 1992); *Stambaugh v. Sullivan*, 929 F.2d 292, 296 (7th Cir. 1991); *Hill v. Sullivan*, 924 F.2d 972, 975 (10th Cir. 1991); *King v. Apfel*, 991 F. Supp. 1101, 1107 (E.D. Mo. 1997); *Anderson v. Callahan*, 981 F. Supp. 1258, 1267 (E.D. Mo. 1997).

other three paragraph B criteria are met. Indeed, the ALJ must either find two paragraph B categories "markedly limited" or find one category "markedly limited" with "repeated" episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

With regard to the paragraph C criteria, substantial evidence supports the ALJ's conclusion that the criteria "would not be met if the claimant stopped the substance abuse." (R. at 14.) The paragraph C criteria are:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

The ALJ specifically found only one episode of decompensation for an extended duration: Plaintiff's hospitalization from December 21, 2007 to March 28, 2008. (R. at 14.) First, the frequency of "episodes of decompensation that generally qualifies as 'repeated' is three within one year, or an average of once every four months." *McGrath v. Astrue*, Civ. No. 10-4192 (ADM/SER), 2012 WL 1004918, at *9 (D. Minn. Mar. 23, 2012) (citing 20 C.F.R. pt. 404, Subpt. P, App. 1). Longer and less frequent episodes may also satisfy the requirement. *Id.* In this case, however, Plaintiff's hospitalizations occurred in 2006, 2007, and

21

2010. These situational periods of decompensation are not close enough in time or long enough to constitute repeated episodes for an extended duration.

The second criterion asks whether a "minimal increase in mental demands or change in environment" would cause Plaintiff to decompensate. Again, the stressors that caused Plaintiff's episodes of decompensation were anything but minimal. Correspondingly, Plaintiff handled the stress of increasing debt, a hearing to reinstate his license, and his wife's unwanted contact, despite having obtained a restraining order, very well. (R. at 298, 302 (noting that he was handling stress by engaging in positive thinking)). Infidelity, familial suicide, and the molestation of one's daughter are significant, potentially debilitating events. The record does not indicate any other potential periods of decompensation, thus there is substantial evidence that the second paragraph C criterion would not be met.

Finally, there is substantial evidence to support a finding that Plaintiff does not have a continued need for living in a "highly supportive living arrangement." Plaintiff has demonstrated that during the times that he is sober and compliant with his medication, he is able to function well and he is motivated to find a job and find his own place. (*See, e.g.*, R. at 304-306.)

Accordingly, the ALJ's decision that Plaintiff does not meet the paragraph B or C criteria is supported by substantial evidence in the record as a whole. Further, the ALJ's failure to attach a PRTF to his decision was not error because he described his findings in his written decision.

III.    **Conclusion**

The record depicts Plaintiff as an impaired man, who has been met with unfortunate circumstances. Despite those circumstances, Plaintiff has demonstrated motivation and an

ability to function when not using alcohol or drugs. Accordingly, the ALJ's decision that substance abuse is a contributing material factor to Plaintiff's disability is supported by substantial evidence in the record as a whole.

**IV.     Recommendation**

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff's Motion for Summary Judgment, filed in error (ECF No. 6), be administratively terminated;

2.     Plaintiff's Motion for Summary Judgment (ECF No. 8) be **DENIED**;

3.     Defendant's Motion for Summary Judgment (ECF No. 11) be **GRANTED**;

4.     **JUDGMENT BE ENTERED ACCORDINGLY**.

Dated: July 25, 2012                             _s/ Jeanne J. Graham_____
                                                 JEANNE J. GRAHAM
                                                 United States Magistrate Judge

**NOTICE**

Pursuant to District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing and serving specific, written objections by **August 9, 2012**. A party may respond to the objections within fourteen days after service thereof. Any objections or responses shall not exceed 3,500 words. The district judge will make a de novo determination of those portions of the Report and Recommendation to which objection is made. The party making the objections must timely order and file the transcript of the hearing unless the parties stipulate that the district judge is not required to review a transcript or the district judge directs otherwise.